UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


REDMELLON, L.L.C, et al.                          CIVIL ACTION

VERSUS                                            NO: 2:23-cv-5754

MOHAMED "HAMMY" HALUM, et al.                     SECTION: T (5)

## ORDER AND REASONS

Before the Court is 1001 Canal, L.L.C., 1015 Canal, L.L.C., 934 Canal, L.L.C., Mohamed "Hammy" Halum, John C. Williams Architects, L.L.C., and John C. Williams, (collectively "Defendants") Motion for Summary Judgment, R. Doc. 82. For the following reasons, the motion is **GRANTED**.

## BACKGROUND

This litigation arises from disputes during the construction and redevelopment of several properties on Canal Street in New Orleans, Louisiana ("the Project"). Plaintiffs are Redmellon, LLC ("Redmellon"), a real estate development company, E. Neal Morris, Redmellon's principal, and Canal Street 1, LLC, a company formed by Morris, (collectively "Plaintiffs"). Redmellon alone asserts Copyright Act claims. But Plaintiffs assert state law claims against Defendants Mohamed "Hammy" Halum, Halum's owned companies, 1001 Canal, LLC, 1015 Canal, LLC, and 934 Canal, LLC (collectively the "Canal Defendants"), an architectural firm, John C. Williams Architects, LLC ("JCWA"), and its principal, John C. Williams (collectively "Defendants").

   a.  **Factual History**

        i.    The PDA and Initial Negotiations

1

The buildings renovated for the Project are 1001-1015 Canal Street and 934 Canal Street ("the Properties"). Halum owns the Properties. In 2018, the New Orleans Downtown Development District ("DDD") approached architectural firm Trapolin-Peer ("Trapolin") to create conceptual drawings for the upper floors of 1001-1015 Canal Street. In 2018, Halum and Morris met to discuss renovating those upper floors and other renovations. Throughout the summer of 2018, Halum and Morris discussed forming a joint venture to develop all of 934 Canal Street and 1001-1015 Canal Street. This is the Project's scope. A Redmellon employee sent Halum on October 25, 2018, a financial model spreadsheet, to demonstrate the potential benefits of the joint venture. Halum and Morris on December 10, 2018, executed a document titled "Pre-Development Agreement" (the "PDA"). The PDA begins with this statement:

> "The purpose of this document is to lay out the terms and conditions which shall form the framework of a ***good faith negotiation towards a definitive Final Development Agreement***, Partnership Agreement for a 'Business Venture…'"

R. Doc. 36-3 at 7 (emphasis added). The PDA outlined a potential joint venture for the development of the Properties. Redmellon and Morris agreed to "undertake traditional predevelopment activities [at their] own expense." *Id.* at 8. Plaintiffs suggest they incurred over $1,000,000 in these pre-development work expenses. R. Doc 93 at n. 96. But the document also stated that "the work product of the pre-development activities shall be owned by Neal Ventures [Morris's company] and Redmellon" should the project not move forward and the close of financing not occur. *Id.* However, the parties did not reach a final agreement and ended negotiations in August 2020. Furthermore, the PDA's last two clauses provide Halum an exit route and disclaim any contractual duties as follows:

> "If upon 6 months time from the execution of this agreement Hammy Halum and Halum Ventures are not reasonably satisfied with the progress of the drafting of the partnership agreement, development agreement, or the pre-development of the Project, Hammy Ventures may declare this agreement null and void with each party owing no obligation to the other.
> Further, ***nothing herein shall be deemed to give rise to any legal obligations***, such obligations arising, if at all, ***only upon the execution of mutually agreeable documentation*** and other required agreements referenced herein."

R. Doc. 36-3 at 9 (emphasis added). Plaintiffs nonetheless contend that the PDA obligated Halum to negotiate final development agreements in good faith. R. Doc. 93-1 at ¶ 16.

ii. <u>The Trapolin Design</u>

As part of these pre-development activities, Redmellon awarded Trapolin pre-development architectural work for the Project on March 8, 2019. Redmellon asked Trapolin to create an architectural blueprint design for the Project, for mixed-use development—hotel and short-term rental occupancy. Plaintiffs also aver that they instructed Trapolin to create the designs to secure tax credits and comply with National Park Service ("NPS") and Louisiana State Historic Preservation Office ("SHPO") regulations. On May 3, 2019, Trapolin and Plaintiffs submitted Part 1 of the Tax Credit Applications to SHPO. Plaintiffs also prepared part 2 of the Tax Credit Applications to SHPO and NPS in 2019 (the "Tax Credit Applications"). In these applications, Plaintiffs described the rehabilitation work to be performed on the buildings and included the Trapolin designs. NPS initially denied certification for Part 2, but Plaintiffs successfully appealed the decision.

Peter Trapolin, principal of Trapolin, identified that design choice in the Project was limited because of regulatory and functional limitations. These limitations included "the means of the egress [because] [it] takes up so much of the floor area that it becomes an issue." R. Doc. 82-

16 at 56:10-58:17. Also, Trapolin Architect Ashley King conceded that "any work on [the Project] would be heavily regulated by SHPO and NPS." R. Doc. 82-17 at 164:12-15. Other design challenges limited design choice because the Project was required to preserve the historical significance of the buildings, such as the historically protected unit—the "Taxi Dance Hall," comply with modern building code requirements, and maintain ground-floor retail space to qualify for tax credits. Any design changes were to be approved by the City of New Orleans Historic District Landmark Commission ("HDLC").

Six months after signing the PDA, Redmellon failed to "circulate drafts of the partnership/operating agreement, lease agreement, and development services agreement." R. Doc. 93-1 at ¶ 21. But Trapolin later issued the "Design Development" drawings for both 934 Canal Street and 1001-1015 Canal Street on August 8, 2019 (the "Trapolin Design"). Redmellon copyrighted the Trapolin Design on September 23, 2023, days before commencing this litigation. The copyright extends to both buildings—one for 934 Canal Street (Copyright Registration Number VAu 1-507-328) (the "328 registration") and one for 1001-1015 Canal Street Restoration & Renovation (Copyright Registration Number VAu 1-507-329) (the "329 Registration").

iii.    Redmellon's Financial Limitations and Project Constraints

The COVID-19 pandemic strained Redmellon's ability to proceed with the Project. In an April 22, 2020 email to Halum, Morris acknowledged "Redmellon is at a stopping point," that "it doesn't make sense for us [Redmellon] to keep…pushing forward," and proposed revisiting the deal in "4 months or 6 months or whenever the debt market picks up again." R. Doc. 82-13 at p. 127. Morris conceded in the same email that he had no objection to Halum no longer proceeding

with Redmellon and that the pre-development investment would be lost:

> "I am also cool with everything I ***spent being a sunk cost*** if you have to go your own way. I am absolutely at peace with that. ***That was the deal I made***."

R. Doc. 82-13 at p. 127. Morris acknowledged in the email that he did not "want to do any more work pushing [the Project] forward." *Id.* Morris's later deposition testimony also concedes that he did not witness any unethical or duplicitous activity.

On May 12, 2020, however, Morris attempted to formalize the business arrangement by presenting a draft of the contemplated, final operating agreement to Halum. This draft contained different terms than what was contemplated in the PDA. Mainly, it suggested forming a joint venture with another entity and left key financing numbers blank. *Id.* at 129. Halum expressed skepticism to this draft because Morris changed elements from the PDA and Halum now believed that he was required to contribute more capital. Morris responded that these changes were due to the capital markets environment because financing during the pandemic now required a "different mix of debt and equity." *Id.* Halum objected and stated that the "deal [was] dead."

Despite this initial breakdown in negotiations, Halum re-engaged in negotiations with Morris on August 4, 2020. Instead of forming a joint venture, Halum drafted a lease proposal where Morris would lease the upper floors of the Buildings. R. Doc. 82-14 at 382:35-383:21. Morris initially expressed interest in this proposal. Ten days later however, Morris admitted that he still lacked a construction loan and investor for the Project and could not agree to those terms. This ended negotiations between Plaintiffs and the Halum Defendants for the Project.

iv.    The Fallout: New Work with JCWA

After the lease agreement fell through, Halum retained a construction supervisor, Duff

5

Friend. Starting in August 2020, Morris issued several warnings to Halum and Friend not to use his "work product"—including the Trapolin Design. Morris also accused Halum of never intending to finalize an agreement and threatened litigation referring to himself as a "litigious motherfucker."

In March 2021, Halum hired Defendant JCWA to develop architectural design plans for the Project. For the designs, JCWA contracted a third party to generate a new electronic source file. JCWA finished its design plans for the Properties in July 2021 ("the JCWA Design"). Plaintiffs allege that the Williams Defendants had improper access to the Trapolin Design. Plaintiffs point to evidence that former JCWA employee, Ashley Dove Greene, typed over the Trapolin Design when developing the JCWA Design. The JCWA Design also accommodates the same mixed-use hotel and retail spaces and sought the same tax credits. Plaintiffs allege that the Williams Defendants obtained all of the Trapolin documents for the Project when preparing its SHPO Part 1 and Part 2 tax credit applications. But rather than submit new tax credit applications, Defendants filed amendments to the Tax Credit applications. Defendants amended the Part 1 applications on July 23, 2021, and the Part 2 applications on October 4, 2022. In the part 2 amendment, Defendants represented to the Tax Credit Agencies that the "[t]he penthouse design and setbacks are proportionally similar to the previous/currently approved design." R. Doc. 93-12 at p. 133.

v.    The Designs Compared

Many of Plaintiffs' allegations center around the alleged similarity between the Trapolin and JCWA designs (collectively, "the Designs"). Plaintiffs cite Trapolin architect Ashley King, who alleges the Designs range from "relatively" to "somewhat similar" in terms of their circulation

path and footprint. R. Doc. 93-1 at ¶ 105. She also claims that the JCWA Design could have been made in other ways to obtain the tax credits. Plaintiffs' expert witness Eric Bethany cites similarities in the Designs' footprints, exterior walls, locations of stairs, and trash chute. *Id.* at ¶ 107.

Plaintiffs however concede there are no similarities between the Desings for the 934 Canal Street and the ground-floor for 1001-1015 Canal Street. *See* R. Doc. 93 at p. 20. As to the top floors of 1001-1015 Canal Street, Defendants argue the Designs are different with regard to: (1) number and size of units vary between the two designs on each floor; (2) bedroom and kitchen areas; (3) shared laundry facilities vs. in-unit washer/dryers; (4) the presence of "lockout" units and communicating doors between most units; (5) rear unit footprints' space division and utilization; (6) Canal Street-facing units opening locations, corridor placements, and internal layouts; and (7) the arrangement of bedrooms, bathrooms, fixtures, and kitchen elements within units. R. Doc. 82-3 at p. 20-21.

The parties also focus on a specific unit "the Taxi Dance Hall." This unit warranted special attention from SHPO and NPS because the Designs were required to preserve the historical cornice to obtain tax credits. *Id.* at 22. Turning to the fourth and fifth-floor penthouses, Defendants cite differences in the footprint, Canal Street façade, and layouts. Plaintiffs' expert Bethany contends that the penthouse floors' footprints are similar.

**b. Procedural History**

Plaintiffs' initial Complaint alleged breach of contract claims against Halum and the Canal Defendants and state law claims against all defendants. R. Doc. 1. The Court granted Defendants'

initial Motion to Dismiss on the grounds that Plaintiffs improperly asserted individual liability merely because Defendants were members or managers of LLCs and granted leave to amend. R. Doc. 28. Plaintiffs filed the First Amended Complaint on February 20, 2024. R. Doc. 31. Defendants moved for partial dismissal for Counts I-IV, copyright infringement claims under 17 U.S.C. § 101, *et seq.*, ("the Copyright Act"), and sought full dismissal for the remaining seven counts under Rule 12(b)(6). R. Doc. 36. The Court granted Defendants' Motion for Partial Dismissal for the Copyright Act claims because Plaintiffs conceded they could not collect statutory penalties or attorneys' costs and fees. R. Doc. 117 at p. 6. As for the remaining counts, the Court dismissed Count V's breach of contract claim but held Plaintiffs had stated an alternative detrimental reliance claim. *Id.* at pp. 7-12. The Court also dismissed the remaining challenges to Plaintiffs' complaint. *Id.* at pp. 12-18.

Now, with discovery completed, Defendants seek summary judgment on all claims. These are: Redmellon's copyright infringement claim, only for actual damages, against the Canal Defendants (Count I), JCWA (Count II), Halum (Count III), and Williams (Count IV); Plaintiffs' detrimental reliance claim against Defendant Halum (Count V); LUTPA claims against the Canal Defendants, JCWA, Halum, and Williams (Counts VI-IX); and civil conspiracy (Count X) and unjust enrichment (Count XI) claims against all Defendants.

## LAW & ANALYSIS

### A. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). The court must find "a factual dispute to be 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party and a fact to be 'material' if it might affect the outcome of the suit under the governing substantive law." *Voelkel McWilliams Const., LLC v. 84 Lumber Co.*, 2015 WL 1184148, at *5 (E.D. La. Mar. 13, 2015) (quoting *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989)). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact and all reasonable inferences are drawn in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.

After the movant meets his burden, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *Gernain v. U.S. Bank Nat' Ass'n*, 920 F.3d 269, 272 (5th Cir. 2019). In doing so, the non-movant must submit "significant probative evidence" in support of his claim. *State Farm Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). However, "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

**B.  <u>Counts I-IV: The Copyright Act</u>**

The summary judgment motion seeks to adjudicate Plaintiffs' request for actual damages, statutory penalties, and attorneys' costs and fees under the Copyright Act. R. Doc. 82 at p. 6. The Court however previously dismissed Plaintiffs' claims for statutory penalties and attorneys' costs and fees. R. Doc. 117 at p. 6. Only Plaintiffs' claims for actual damages remain and are addressed here.

### a. The Parties' Arguments

Defendants first argue Plaintiffs' infringement claim for the JCWA 1001-1015 Canal plans are not viable. R. Doc. 82 at pp. 8-17. Plaintiffs define the "copyrighted plans" to include both the "architectural designs and technical drawings for 934 Canal Street and the 1001-1015 Canal Street"—i.e., the Trapolin designs for the Properties. *Id.* at pp. 8-9 (citing R. Doc. 31, FAC ¶¶ 38, 46, 51, 55, 61).

Defendants contend that Plaintiffs' copyright claims only concern similarities on 1001-1015 Canal Street—the 329 Registration. *Id.* Defendants assert Plaintiffs' copyright claims at best address the "unification" of upper floors in 1001-1015 Canal building, conversion of the buildings "into short-term rentals or hotel apartment rentals," and "addition of a rooftop floor for penthouse suites." *Id.* (citing R. Doc. 31, FAC ¶¶ 46, 51, 55, 61). Defendants argue these building elements are unprotectable. *Id.* at pp. 8-9.

Defendants also contend the design choices for the Project were largely dictated by functionality concerns. These include: the placement of the stairwell, corridor, and trash chute; use of existing masonry party walls as internal demising walls; and NPS and SHPO regulations. *Id.* at pp. 13-17. With these limitations, Defendants argue there is little to no original expression in the

10

Trapolin design.

Even if the Court were to conclude Plaintiffs' copyright claims concerned viable, protectable elements, Defendants argue that no reasonable juror would conclude that the layouts are substantially similar. *Id.* at pp. 17-24. They contend there is no genuine dispute of material fact that Plaintiffs do not meet their burden on substantial similarity because of differences between the Designs for 1001-1015 Canal Street for: (1) the ground-floor plans, (2) upper-floor plan layout, (3) individual unit designs, (4) penthouses, and (5) kitchens. *Id.* at pp. 18-24. Defendants note that summary judgment is also warranted for the 328 registration, 934 Canal Street, because the Plaintiffs do not allege any similarities.

Plaintiffs' opposition opens with claims that summary judgement is allegedly disfavored in the Copyright Act context. R. Doc. 93 at p. 7. Regardless, Plaintiffs assert that they meet the elements for infringement under *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527 (5th Cir. 2015). *Id.*

Plaintiffs claim they prove (1) **ownership of copyrighted material**: because Redmellon owns the 328 & 329 Registrations, and present a genuine dispute of material fact as to (2) **factual copying**: by three instances where Defendants had access to the copyrighted material and the "probative similarity" between the Trapolin and JCWA designs[1], and (3) **substantial similarity:**

---

[1] The three alleged instances where Defendants had access to the cited work are: (1) JCWA former employee Ashley Dove added notations to Trapolin designs while developing JCWA schematic design set, (2) Williams took pictures of the Trapolin designs in Halum's office, and (3) Halum and Duff Friend, the Halum Defendants' construction supervisor, transmitted plan sheets with certain construction details and designs from the Gross Medium Price Set ("GMP") of the Trapolin drawings, that had the "Trapolin-Peer" identifying marks and logos, to the Williams Defendants.

11

between the designs for the: (a) arrangement and composition of spaces for upper floors of 1001-1015 Canal, (b) horizontal circulation via a double-loaded corridor, (c) penthouse design, and, (e) gallery-style kitchens. *Id.* at pp. at 12-19. At a minimum Plaintiffs argue Defendants fail to carry their burden because they must show that "no reasonable juror could find substantial similarity." Plaintiffs maintain that they only need to demonstrate that a small portion of their work is copied. *Id.*

### b.  <u>Element One: Ownership of A Valid Copyright</u>

Copyright infringement claims have three elements: "(1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 549 (5th Cir. 2015) (citing *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam)). The Copyright Act provides that a certificate of copyright registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c). An unrebutted presumption is sufficient evidence a plaintiff has a prima facie case for ownership of a valid copyright. *Nola Spice*, 783 F.3d at 549 (citing *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008).

Plaintiffs satisfy element one. Redmellon owns copyrights to the Trapolin designs for the 934 Canal, the 328 Registration, and 1001-1015 Canal, the 329 Registration. R. Doc. 93-1 at ¶ 47.

### c.  <u>Element Two: Factual Copying</u>

Element two, factual copying, can be inferred. "[Factual] copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work

("access") and (2) probative similarity." *Peel & Co. v. The Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001). However, "[i]f the two works are so *strikingly similar* as to preclude the possibility of independent creation, 'copying' may be proved without a showing of access." *Id.* (citing *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 113 (5th Cir. 1978) (emphasis added). Striking similarities are "similarities…that can *only* be explained by copying, rather than by coincidence, independent creation, or prior common source.'" *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1039 (5th Cir. 2015) (quoting *Selle v. Gibb*, 741 F.2d 896, 904 (7th Cir. 1984)).

To start, Plaintiffs cannot show striking similarity and, therefore, must independently show access. There are numerous architectural differences between the Designs, including the 1001-1015 Canal ground-floor, so they "are in no way similar enough" for a reasonable jury to find striking similarity. *Armour*, 512 F.3d at 156 n. 19. For example, Plaintiffs conceded the Designs are different for 1001-1015 Canal Steet's ground-floor and 934 Canal Street.[2] *See* R. Doc. 93 at p. 20 (noting there are "alleged differences in the plans for 934 Canal Street and the ground floor of 1001-1015 Canal Street," but emphasizing that the copyright infringement claims were focused on the upper floors). Absent striking similarity, Plaintiffs must show access.

Access requires a showing that "the person who created the allegedly infringing work had a reasonable opportunity to view [or hear] the copyrighted work." *Batiste v. Lewis*, 976 F.3d 493, 503 (5th Cir. 2020) (quoting *Peel*, 283 F.3d at 394). A "bare possibility" of access is not enough, nor is a theory of access "based on speculation and conjecture." *Id.* (quoting *Peel*, 283 F.3d at 394-

---

[2] The alleged differences for the ground-floor of 1001-1015 Canal include "(a) the location of the 1001 Canal building entry, (b) hotel lobby locations, (c) elevator placement, (d) restaurant design and arrangement in 1001 and 1005, and (e) overall circulation." *See* R. Doc. 82-3 at pp. 18-19.

95). The plaintiff must present evidence that is "significantly probative of a reasonable opportunity for access." *Armour*, 512 F.3d at 153.

Plaintiffs cite three access opportunities to the Trapolin designs: (a) JCWA's employee Greene's added notations on June 19, 2021, when developing the JCWA design,[3] (b) Williams taking pictures of the design,[4] and (c) Halum and Friend's transmission of plan sheets, including certain construction details and designs from the Trapolin drawings, to the Williams Defendants.[5] Defendants initially state that they do not concede "whether JCWA had access to Redmellon's work product or documents prepared by Trapolin for Redmellon" or these allegations. *See* R. Doc. 82-3 at n.15. However, this point is later effectively conceded as Defendants characterize "JCWA's access to Trapolin's materials is no different than…[what] substitute counsel requires to the file of a client's former counsel." R. Doc. 106 at p. 5. Motives aside, Defendants' admission satisfies the access prong.

Turning to probative similarity, Plaintiffs must raise a genuine issue of material fact that the Designs, when compared as a whole, are "adequately similar to establish appropriation." *Peel*, 238 F.3d at 397. Probative similarity is, however, not substantial similarity. *See Lennar Homes of Tex. Sales & Mktg. v. Perry Homes, LLC*, 117 F. Supp. 3d 933, 934 (S.D. Tex. 2015). "Any similarities between the two works," even as to unprotectable elements, "that, in the normal course of events, would not be expected to arise independently" suffice. *Batiste*, 976 F.3d at 502 (citing *Positive Black Talk Inc. v. Cash Money Recs., Inc.*, 394 F.3d 357, 370, n. 9 (5th Cir. 2004)).

---

[3] R. Doc. 93-12, JCWA Depo. at 79:2–83:21.
[4] *Id.* at 68:23–69:24.
[5] *Id.* Exhs. 42–43

Plaintiffs have met their burden to show *any* similarities between the two designs. Plaintiffs notably point to *some* similarities between the arrangement and composition of spaces in the Designs for the upper floors of 1001-1015 Canal Street. R. Doc. 93 at p. 16. Plaintiffs also note that Defendants in the Tax Credit Amendments represented that the JCWA design is "proportionally similar to [the Trapolin] design." Defendants argue that these similarities are in unprotectable elements—where choice was limited or non-existent because of regulatory and functional considerations. R. Doc. 82-3 at pp. 10-17; *see also* R. Doc. 93 at p. 10. But factual copying does not consider protectability or whether the claims are actionable. Because Plaintiffs have put forward enough evidence on probative similarity and access to carry their burden at trial, the Court cannot grant summary judgment on factual copying.

### d.  Element Three: Substantial Similarity

Nevertheless, "[n]ot all copying ... is copyright infringement." *Engineering Dynamics, Inc. v. Structural Software, Inc*., 26 F.3d 1335, 1340-41 (5th Cir. 1994) (citing *Feist Publications. Inc. v. Rural Telephone Service Co., Inc*., 111 S. Ct. 1282, 1296 (1991)). The more difficult question is whether the copying is legally actionable. This is element three—whether there is "substantial similarity between the two works." *Id*. at 1341.

The Fifth Circuit has recognized that while substantial similarity is "typically…left to the factfinder, summary judgment may be appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity." *Peel*, 238 F.3d at 395 (footnote omitted). Courts have noted that the substantial similarity analysis is often more reliably and accurately resolved in

15

a summary judgment proceeding. *See, e.g.*, *Intervest Const., Inc. v. Canterbury Est. Homes, Inc.*, 554 F.3d 914, 919 (11th Cir. 2008). That is because the "already difficult task" of examining architectural arrangements, which by their nature contain elements that are common to each of the works and are not copyrightable by themselves, becomes "nuanced." *Id.*

Courts assess substantial similarity in two parts. First, courts "distinguish between the protectable and unprotectable elements of the copyrighted work." *Nola Spice*, 783 F.3d at 550 (citing *Peel*, 238 F.3d at 398). Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scènes à faire* material, and other unprotectable elements suggested by the particular facts under examination. *Eng'g Dynamics*, 26 F.3d at 1343 (internal citations omitted). After filtration, the Court conducts a side-by-side comparison to determine whether the allegedly infringing material bears a substantial similarity to the protectable aspects of the original work. *Nola Spice*, 783 F.3d at 550 (citing *Peel*, 238 F.3d at 398).

### i.    Step One: Filtration—Merger Doctrine and Scènes à Faire

On filtration, Defendants cite to two independent barriers that they claim prevent or limit the Court's side-by-side analysis—the merger doctrine and *scènes à faire*. R. Doc. 82-3 at pp. 10-16. "[W]hen an idea can be expressed in very few ways, copyright law does not protect [or limit] its expression" because the ideas are said to be "merged." *Kepner–Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 533-34 (5th Cir. 1994). "[T]he mere fact that [a plaintiff's works] are copyrighted does not mean that all aspects of those [works] are automatically protected." *Id.* Rather, if parts of the work constitute an idea, concept, method, or *scènes à faire*, the copyright

does not extend to the unprotectable elements. Unprotectable elements are generally not actionable. *Batiste v. Najm*, 28 F. Supp. 3d 595, 600 (E.D. La. 2014). *Scènes à faire* or "scenes which must be done" are "expressions that are standard, stock or common to a particular subject matter or are dictated by external factors." *Eng'g Dynamics*, 26 F.3d at 1344. Thus, elements that are customary to or dictated by the genre or field are not protected because they are not original. *Najm*, 28 F. Supp. 3d at 601.

Defendants argue that Plaintiffs' copyright claims are limited under the merger doctrine and *scènes à faire* because any similarities between upper floors of 1001-1015 Canal Street are unprotectable. Specifically, Defendants contend that "unification" of upper floors of the 1001-1015 Canal Street buildings, conversion of the buildings "into short-term rentals or hotel apartment rentals," and "addition of a rooftop floor for penthouse suites" are unprotectable ideas. R. Doc. 82-3 at p. 9. Defendants next suggest that the Trapolin Design is limited under the merger doctrine because the NPS and SHPO tax credits, building codes, functional demands, and existing structures make it so that the Project could "only be expressed in a very limited number of ways." *Id.* at p. 10 (citing *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 34-36 (1st Cir. 2001)). And for those elements not included as merged, Defendants suggest they are unprotectable architectural *scènes à faire*. These allegedly include: (1) the placement of the stairwell, corridor, and trash chute, (2) the existing masonry pantry walls and internal demising walls, (3) the Taxi Dance Hall unit in the 1001 Canal Street building, and (4) the floor plan. *Id.* at pp. 13-17.

Plaintiffs concede that the Trapolin design does contain "protectable and *unprotectable* elements." R. Doc. 93 at p. 8. However, Plaintiffs suggest their copyright infringement claims are

17

not based on specific elements but concern the whole project. *Id.* They argue Trapolin's arrangement of units and the composition of spaces in the Project is protectable—even if the arrangement consists of wholly unprotectable elements. *Id.* at pp. 10-11 (citing *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, No. 3:15CV00666, 2018 WL 1583103, at *14 (N.D. Ohio Mar. 30, 2018); *see also Nola Spice*, 783 F. 3d at 551.

The Court agrees with Defendants that Plaintiffs' design options were limited by the merger doctrine and unprotectable *scènes à faire*. The merger doctrine is based on the statutory prohibition against copyright protection for ideas. *See* 17 U.S.C. § 102(b). When an idea or concept "can be expressed in very few ways" the idea and the expression are said to be "merged." *Najm*, 28 F.Supp.3d at 595 (citing *Kepner-Tregoe, Inc.*, 12 F.3d 527 at 533). The *scènes à faire* doctrine in architecture encompasses standard design elements and decisions motivated by market expectations. *Lennar*, 117 F.Supp.3d at 939 (citing *Zalewski*, 754 F.3d 105–06). These "[d]esign features used by all architects…get no protection." *Id.* The placement of windows, a stairwell, corridor, trash chute, and floorplan are standard elements found in every apartment. These elements alone are filtered from the side-by-side analysis and get no individual protection.

The Court also finds there is no genuine dispute of material fact that the Designs were heavily constrained by NPS, USPO, and HDLC regulations. For example, Plaintiffs' expert Eric Bethany concedes that both designs sought to comply with the Secretary of Interior's Standards for rehabilitation. R. Doc. 93-3 at p. 11. Bethany admits that these limitations presented "constraint[s]" on new rooftop additions. *Id.* at p. 16. But the limitations evidently go beyond the rooftop. Indeed, the Secretary of the Interior's mandatory NPS regulations restrict all interior and

18

exterior elements in the Project. A rehabilitation project for certification purposes encompasses "all work on the interior and exterior of the certified historic structure(s) and its site and environment, as determined by the Secretary, as well as related demolition, new construction or rehabilitation work which may affect the historic qualities." 36 CFR § 67.6(b) (2024). Furthermore, all elements of the rehabilitation project must meet the Secretary's ten Standards for Rehabilitation (§ 67.7); and "portions of the rehabilitation project not in conformance with the Standards may not be exempted." 36 CFR § 67.6(b)(1) (2024). The Secretary's standards even mandate:

- "the property *shall* be used for its historic purpose or be placed in a new use that requires minimal change to the defining characteristics of the building …";

- "[t]he historic character of a property *shall* be retained and preserved";

- "[d]istinctive features, finishes, and construction techniques or examples of craftsmanship that characterize a historic property *shall* be preserved";

- "[d]eteriorated historic features *shall* be repaired rather than replaced"; and

- "[n]ew additions, exterior alterations, or related new construction *shall not* destroy historic materials that characterize the property" with "[t]he new work… differentiated from the old and … compatible with the massing, size, scale, and architectural features to protect the historic integrity of the property and its environment."

R. Doc. 82-3 at p. 14 (quoting 36 CFR § 67.7(b)). The Project was also constrained by HDLC regulations. Any modification to the Properties' exterior had to be approved by the HDLC. HDLC

required any Canal Street renovation to "[p]reserve[e] [] the cohesive ambiance of historic resources with compatible, sympathetic construction," "[c]ompatible siting, proportion, scale, form, materials, fenestration, roof configuration, details and finishes" and mandated that "[c]onstruction of additions at secondary elevations … [be] subordinate to the historic building" "so that the historic building fabric is not radically changed, obscured, damaged or destroyed." R. Doc. 82-5 at p. 10.

Peter Trapolin, the owner of the Trapolin firm, observed these regulatory and functional limitations when constructing the designs. For example, he noted that "the means of the egress takes up so much of the floor area that it becomes an issue" in designing the redevelopment. R. Doc. 82-16 at 56:10-58:17. Also Trapolin Architect Ashley King conceded that "any work on [the Project] would be heavily regulated by SHPO and NPS." R. Doc. 82-17 at 164:12-15.

Even if there were some other options to comply with the regulatory restrictions, it is uncontested that the regulations limited Trapolin's choices and its originality. Plaintiffs' expert Bethany admits that both Designs sought to develop plans for the same "mixed-use development with ground floor retail spaces below multiple floors of hotel units" and both sought to get the same tax credits. R. Doc. 93-3 at p. 11. There are only so many ways to design the same building for the same use, to comply with the same regulations. These regulatory restrictions thus limited the number of ways Trapolin could have arranged the units or spaces for the Project. Because of these limitations, the Court in the side-by-side analysis must find *more* similarities to conclude that there is a genuine dispute of material fact as to substantial similarity. *Lennar*, 117 F.Supp.3d at 935. Further, any similarities in the placement of the stairwell, corridor, and trash chute, and the

20

Designs' floorplan do not count in the analysis because they are unprotectable *scènes à faire*.

When looking at the similar elements individually, Plaintiffs make no reference to any single feature that is individually protectable. However, this does not mean that the Trapolin Design as a whole is unprotectable. The Court instead must consider overall Design and arrangement as a protectable whole. *See Lennar*, 117 F.3d at 940 (considering the arrangement of an architectural design as a whole but only after filtration).

When considering the Design as a protectable whole, the Court also determines the scope of protection here is "thin." "Many copyrights represent significant creative effort, and are therefore reasonably robust, whereas others reflect only scant creativity." *Lennar*, 117 F.Supp.3d at 935. "More similarity is required when less protectible matter is at issue." *Id*. Thus, "the scope of copyright protection [is] a sliding scale that changes with the availability of expressions for a given idea." *Eng'g Dynamics*, 26 F.3d at 1348 (citing *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 831 F.Supp. 202, 209 (D. Mass. 1993)). To the extent that a work is "highly functional" or comprised of "highly standardized" elements it "may lie very near the line of uncopyrightability." *See id.* Copyright protection in such works is thin. *See id.* n. 15.

This sliding scale applies in architectural works. "Some architectural designs, like that of a single-room log cabin, will consist solely of standard features arranged in standard ways; others, like the Guggenheim, will include standard features, but also present something entirely new. Architecture, in this regard, is like every art form." *Lennar*, 831 F.Supp.3d at 935 (citing *Zalewski*, 754 F.3d at 103–04). Where the author's original contribution is "slight," his copyright may be "very thin." *Id*. at 107.

Applying the sliding scale here, the Trapolin Design is entitled only to "thin" copyright because there is little originality. Plaintiffs argue originality is found in their arrangement and composition of spaces for the upper floors of 1001-1015 Canal Street. Yet Plaintiffs' alleged originality consists of functional elements within two units. First, they cite to originality in Trapolin's decision to have a circulation path via a double-loaded corridor running parallel to the street. However, courts have held that decisions on how to "route the flow of traffic" are "unprotectable" because they are one of few ways to arrange a functional necessity. *See, e.g.*, *Zalewski*, 754 F.3d at 106. Plaintiffs also claim that 1001 Canal Street building's pre-existing window openings evidences protected creative expression. Again, these windows were pre-existing openings that had to be preserved under NPS regulations and the decision to have standard elements comply with a regulation is not original. *See* 36 CFR § 67.6(b) (2024); *see also Lennar*, 117 F.Supp.3d at 934 (citing H.R.Rep. No. 101–735, *reprinted in* 1990 U.S.C.C.A.N. 6935, 6949). Both Designs were created for the same mixed-use, so any decisions on footprint were also directed by market considerations. *See id.* (choices on footprint are generally not original because they are driven by market considerations).

On top of these restrictions, both designs were intended to secure the same tax credits. These tax credits are conditioned on complying with the same regulations and limitations where the Project had to preserve *all* historical elements, preserve the same historic character—for the exact same mixed-use purpose, all while conducting "minimal change[s] to the defining characteristics of the building." *See* CFR § 67.6(b). So any aesthetic choices Trapolin made were limited because it had to comply with functional and regulatory restrictions. *See Home Design*

22

*Servs., Inc. v. Starwood Const., Inc.*, 801 F. Supp. 2d 1111, 1119 (D. Colo. 2011) (noting that standard architectural features often invoke the merger doctrine because arrangement can only occur in limited ways).

The Court's holding that Plaintiffs are entitled only to thin copyright protection for the Trapolin designs is best evidenced by similar architectural copyright cases, *Lennar* and *Zalewski*. Both courts concluded that the arrangement of standard unprotectable elements in an architectural copyright action suggested "thin" copyright protection because each plaintiff's arrangement contained little original expression in light of regulatory restrictions.

*Lennar* concerned alleged copyright infringement for home designs. 117 F.Supp.3d 913. In the filtering stage, the Court concluded that the plaintiffs' decisions on the size, dimensions, overall form, and look and feel were not original because the plans were constrained by external development criteria. *Id*. at 943-44. The plaintiffs argued there were multiple ways to comply with these external development criteria. *Id.* at 940. But the court still concluded the plaintiffs had only "thin" copyright protection because the criteria restricted the arrangement of these unprotectable elements. *Id.* at 944. Indeed, the court noted that "the relevant constraints need not be absolute. They only need to narrow the range of available expression such that protection certain aspects of [the plaintiffs'] works would grant [them] an impermissible monopoly on designs that meet those considerations." *Id.* Because the external development criteria sufficiently constrained the general layout, the precise arrangement and composition of spaces in the plaintiffs' contributions were slight. Therefore, the court held the work was entitled to thin copyright protection. *Id.*

Even more on point is *Zalewski*. The plaintiff there alleged the defendants copied the layout

23

and arrangement in an architectural work. The Second Circuit affirmed summary judgment for the defendants. It noted that "any design elements attributed to building codes, topography, structures that already exist…get no protection." 754 F.3d at 105. The court applied these principles to architectural project's arrangement and layout and held "the overall footprint of the house and the size of the rooms are 'design parameters' dictated by consumer preferences and the lot the house will occupy, not the architect"; (b) the "general layout" and the "location, size, and general design" of individual elements were attributable to the house's "colonial archetype"; and (c) "[t]here are only so many ways to arrange four bedrooms upstairs and a kitchen, dining room, living room, and study downstairs." *Id.* at 107. Although the plaintiff's design was "certainly of [his] own expression" because arrangement and layout were determined by external factors, the court determined that the protection for the design was thin.

This is also the case here. In short, Plaintiffs' copyright claim here concerns the arrangement of unprotectable elements—hallways, kitchens, and trash chutes. Because the composition and arrangement of these otherwise unprotectable elements were further limited due to regulatory considerations, original contribution in the Trapolin design is slight—regardless of whether there is more than one way to arrange the Project. Therefore, protectable expression for the Trapolin Design warrants thin copyright protection.

### ii.    <u>Step Two: Side-By-Side Comparison</u>

After filtering, the Court typically assesses side-by-side "whether the allegedly infringing work bears a substantial similarity to the protectable aspects of the original work." *Peel & Co.*, 238 F.3d at 398. When copyrighted works are entitled to "thin" protection, a work must be

"virtually identical to infringe." *Lennar,* 117 F.Supp.3d at 935 (citing *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010)); *see also Feist*, 499 U.S. at 349 (the level of copyright protection for an arrangement or compilation of non-protectable elements is thin). Courts modify the definition of "substantial similarity" to accentuate a narrower scope of protection. *Intervest*, 554 F.3d at 921. This has been applied to mean that "only near verbatim copying" will be "substantially similar" for thin copyrights. *Lennar*, 117 F.Supp.3d at 935 (citing *id.*). The side-by-side assesses the works from the perspective of a "layman" or "ordinary observer." *Nola Spice*, 783 F.4d at 55. The Fifth Circuit also instructs courts to consider "the importance of the copied protectable elements to the copyrighted work as a whole." *Id.*; *see also Positive Black Talk*, 394 F.3d at 373 n. 12; *Eng'g Dynamics, Inc.*, 26 F.3d at 1343.

Reviewing the two Designs side-by-side for the "whole project," it is evident that no reasonable juror would find the two to meet the heightened substantial similarity standard. Plaintiffs first do not allege *any* similarities between the Designs for 934 Canal Street and the ground-floor of 1001-1015 Canal Street. This strikes against the whole Project being substantially similar. At best, the alleged similarities occur only in some floors for one of the two parts in the copyrighted Trapolin Design.

Even where Plaintiffs allege similarities, the Designs are not close to being identical. Plaintiffs for example point to units 203/211. *See* Image 1. They allege similarities in a long hallway running the length of the unit, and galley-style kitchens. R. Doc. 93 at p. 18. But the units themselves have plain differences in arrangement including: (1) the shape of the bedrooms and bathrooms, (2) the presence of bathrooms intersecting the two bedrooms in the JCWA design, and

(3) the hallway where the Trapolin Design has an L-shaped diversion into Bedroom 1. *See* R. Doc. 93 at p. 18. The Trapolin architect, King, characterizes the units as only "*somewhat similar*"—not "substantially similar" and certainly not almost identical. When comparing the fifth-floor penthouse designs, the Trapolin Design is 1,155 square feet larger than the JCWA design and contains a prominent lightwell interrupting the livable space. *See* R. Doc. 82-3 at p. 1; Image 2. There is also no creativity for no for the placement of the kitchen and living room because they rationally must be put in front of the windows. *See* Image 1. How the remaining windowless bedrooms and bathrooms are configured are thus shaped by the functional limitations—what is left in the footprint. There must accordingly be a hallway to connect those rooms, so its placement is neither creative nor original.

 

Image 14 - Unit 203 floor plan, Trapolin Peer design.    Image 15 - Unit 211 floor plan, Williams Architects design.

R. Doc. 93 at p. 18. Image 1.

26



R. Doc. 93 at p. 18. Image 2.

Considering the two Designs as a protectable whole, they contain evident differences and for many areas of the Project, Plaintiffs do not suggest any similarities. There is thus no genuine dispute of material fact that Redmellon's Trapolin Design fails to meet the enhanced substantial similarity standard for its thin copyright protection. Defendants are entitled to summary judgement on Counts I-IV.

### C. <u>COUNT V: DETRIMENTAL RELIANCE</u>

The Court now turns to the state law claims. Count V is an alternative determinantal reliance claim. The Court previously dismissed the breach of contract claim with prejudice. R. Doc. 117 at pp. 7-12. Defendants argue that Plaintiffs cannot assert reliance upon Halum's external conduct or the PDA because reliance is presumptively unreasonable here absent a valid, written final agreement. R. Doc. 82-3 at pp. 39-40.

Plaintiffs' opposition argues the determinantal reliance claims should survive because there is a dispute as to whether the parties intended to be bound by the PDA. R. Doc. 93 at pp. 37-41. They claim Halum's post-PDA actions evidences his intent. Beyond the PDA, Plaintiffs' also assert they can rely on Halum's oral representations for this alternative detrimental reliance claim. *Id.* at p. 41.

"A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." La. Civ. Code. art. 1967. These determinantal reliance claims must be supported by evidence that shows: "(1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Suire v. Lafayette City–Parish Consol. Gov't*, 2004–1459 (La. 2005); 907 So.2d 37, 59. Louisiana courts hold it is "difficult to recover under the theory of determinantal reliance." *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 334 (5th Cir. 2007) (citing *May v. Harris Management Corp.*, 04–2657 (La. App. 2005), 928 So.2d 140, 145; *Wilkinson v. Wilkinson*, 323 So.2d 120, 126 (La. 1975); *Barnett v. Bd. of Tr. for State Coll. & Univs.*, 00–1041 (La. App. 2001), 809 So.2d 184, 189). These claims are "not favored in Louisiana." *Id.*

A plaintiff nonetheless does not need to establish an enforceable contract as he would under a breach of contract claim. *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993). He must show that he detrimentally relied on a promise and that his reliance was reasonable. *Id.*

Plaintiffs here attempt to establish detrimental reliance in two ways—the PDA and

28

Halum's representations. As the Court held in its order on the motion to dismiss, the PDA is not a contract because its plain language disclaims contractual obligations. *See* R. Doc. 117. This holding does not resolve the determinantal reliance issue because claims can be predicated on agreements that are not contracts. *See Newport*, 6 F.3d at 1069.

That is, however, is not the case here. Reliance on the PDA and Halum's subsequent conduct is presumptively unreasonable as a matter of law. In Louisiana, "the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 254 (5th Cir. 2008) (citing *Suire*, 907 So.2d at 59). The PDA's plain language clearly states that no legal obligations arise from it. "[O]nly upon the execution of a mutually agreeable documentation" does any of Halum's "obligations aris[e]." R. Doc. 36-3 at 9. The parties contemplated that the "mutually agreeable documentation" would be a final, written partnership agreement. *Id.* There is no dispute that the parties failed to reach such an agreement.

Plaintiffs were thus on notice that Halum's representations would be legally unenforceable absent a final agreement. Morris appreciated this because his April 22, 2022 email to Halum indicated that Halum was under no legal obligations to carry out an agreement and invited him to seek opportunities elsewhere. R. Doc. 82-13 at p. 127 (characterizing the pre-development expenses as "being a sunk cost if you [Halum] have to go your own way….that was the deal I [Morris] made.")

The Fifth Circuit and this district have recognized that reliance on oral conduct is

29

presumptively unreasonable for detrimental reliance claims when the parties anticipated entering a final, written agreement, and the proposed terms of the written agreement were not mutually agreeable. *Rogers v. Brooks*, 122 F. App'x 729, 733 (5th Cir. 2004) (per curiam); *see also D & S Marine Transportation, LLC v. S & K Marine, LLC*, No. CV 14-2048, 2016 WL 6892437, at *12 (E.D. La. Nov. 23, 2016). *Annie Sloan Interiors, Ltd. v. Davis Paint Company* is distinguishable because the PDA here explicitly contemplates that the parties intended to put any agreement they would have into a final writing. 2019 WL 1967029, at *5 (E.D. La. May 2, 2019); *see also* R. Doc. 36-3 at 9 ("only upon the execution of a mutually agreeable documentation" do any legal obligations arise).

Moreover, the Fifth Circuit and courts have rejected reliance on a non-binding letter at the summary judgment stage. *Velocity Energy Ltd. LLC v. Chevron USA Inc.*, 204 Fed. App'x 433 (5th Cir. 2006) (per curiam); *see, e.g.*, *Matheson Tri-Gas, Inc. v. Williamson Gen. Contractors, Inc.*, No. 2:16-CV-1303, 2019 WL 1562247, at *6 (W.D. La. Feb. 28, 2019), *report and recommendation adopted*, No. 2:16-CV-01303, 2019 WL 1561369 (W.D. La. Apr. 10, 2019). The nonbinding letter in *Velocity,* which "contemplated that both parties would work toward an eventual binding ... agreement," was characterized as a "classic example of a non-binding agreement" and the court concluded that reliance on it was "presumptively unreasonable." *Id*. at 435.

Thus, Plaintiffs cannot rely on the PDA or Halum's external conduct even for this detrimental reliance claim. There is no genuine dispute of material fact that the PDA is non-binding and that the parties did not come to an anticipated final agreement. Plaintiffs do not show that there

30

was any other outside written agreement that predates the PDA. Therefore, any reliance on the PDA or Halum's oral representations is presumptively unreasonable and the determinantal reliance claim cannot survive.

**D. <u>COUNTS VI-IX: LUTPA</u>**

Defendants argue that Plaintiffs' LUTPA claims should be dismissed because they are (1) prescripted, (2) preempted, and (3) fail on the merits. The Court previously rejected Defendants' arguments on copyright prescription and preemption and does so here on the same grounds. *See* R. Doc. 117 at p. 12-15. The Court will address only the new merits argument.

Defendants maintain that Plaintiffs LUTPA allegations are predicated only on the alleged misuse of confidential information. They contend the LUTPA claims should thus be dismissed because they are allegedly identical to the dismissed claim in *Matrix HVAC, LLC v. Daikin Applied Ams., Inc.* 2024 WL 1299519, at *1 (E.D. La. Mar. 27, 2024)*. R. Doc. 82 at pp. 29-31. Defendants also argue that Plaintiffs cannot show they were injured by the alleged LUTPA conduct because Plaintiffs incurred all pre-development costs *before* Defendants' alleged misuse of information. *Id.* at p. 7; R. Doc. 106 at p. 14.

Plaintiffs suggest that their LUTPA claim does not need to be premised on specific factors. R. Doc. 93 at pp. 24-25. They instead claim that LUTPA claims extend to all egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct. Here, these violations are purportedly evidenced by the alleged use and benefit from Plaintiffs' pre-development activities, ongoing pursuit of the Tax Credit applications, and use of Plaintiffs' work product. R. Doc. 93 at p. 26-28 (listing Defendants' actions that Plaintiffs allege violate the

LUTPA).

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. R.S. § 51:1405(A). A practice is unfair under LUTPA only when "the practice offends established public policy and is immoral, unethical, oppressive or unscrupulous." § 51:1409(A) (internal quotations omitted); *see also Monroe v. McDaniel*, 207 So. 3d 1172, 1180 (La. App. 5 Cir. 2016). The Louisiana Supreme Court has advised that the "range of prohibited practices under LUTPA is extremely narrow and includes only egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 2010), 35 So. 3d 1053, 1059. Courts determine an unfair trade practice on a "case-by-case basis." *IberiaBank v. Broussard*, 907 F.3d 826, 839 (5th Cir. 2018). The defendant's motivation is nevertheless a critical factor and his "actions must have been taken with the specific purpose of harming the competition." *Id.* (citing *Monroe v. McDaniel*, 16-214 (La. App. 2016), 207 So. 3d 1172, 1180).

"LUTPA recognizes a claim for breach of fiduciary duty that rests on the misappropriation of information that is confidential but not a trade secret." *See CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, 888 F. Supp. 2d 780, 795 (E.D. La. 2012). A plaintiff must nonetheless prove: "(1) that it possesses knowledge or information that is not generally known; (2) that it communicated the knowledge or information to the defendant under an express or implied agreement limiting the defendant's use or disclosure of the information; and (3) that the defendant used or disclosed the knowledge or information in violation of the confidence, *resulting in injury to the plaintiff*." *Ruby*

32

*Slipper Cafe, LLC v. Belou*, No. CV 18-1548, 2019 WL 1254897, at *7 (E.D. La. Mar. 19, 2019) (citing *Engineered Mech. Servs., Inc. v. Langlois*, 464 So. 2d 329, 334 (La. App. 1984)); *see also Source Prod. & Equip. Co. v. Schehr*, 612 F. Supp. 3d 646, 656 (E.D. La. 2020) (emphasis added).

Plaintiffs' LUTPA allegations are at their core claims of misappropriation, disclosure, or misuse of alleged confidential information. They assert that Defendants improperly appropriated the Trapolin designs in their amendments to the Tax Credit Applications, shared the designs with unauthorized parties, incorporated those elements into the Project without authorization, and used Plaintiffs pre-development activities to pursue damages in another litigation. R. Doc. 93 at pp. 25-28. Common to all these assertions is the claim that Defendants used the purportedly confidential information in some allegedly impermissible way. Thus the three-factor test as stated above applies.

Plaintiffs' LUTPA claims fail on element three because Plaintiffs cannot show that any LUTPA-violative conduct caused any of their injuries. LUTPA plaintiffs must prove an "ascertainable loss of money or movable property...*as a result of* " the alleged LUTPA violation. La. Rev. Stat. § 51:1409 (emphasis added). When the conduct does not cause a loss of money or property, there is no LUTPA claim. *See Bobby & Ray Williams P'ship v. Shreveport Louisiana Hayride Co.*, 873 So.2d 739, 746 (La. Ct. App. 2004) (finding that a plaintiff failed to state a claim under LUTPA where he did not allege that defendant's conduct caused him to lose money or property); *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, No. CIV.A. 10-4505, 2011 WL 3268386, at *10 (E.D. La. July 28, 2011) (dismissing LUTPA claims because the factual allegations did not show any loss of business or any other form of identifiable damage caused by

the alleged LUTPA conduct).

All the alleged LUTPA conduct occurred *after* Plaintiffs incurred their pre-development expenses and left the Project in August 2020. *See generally* R. Doc. 93. The pre-development expenses are the only alleged ascertainable loss of money or property. But it is uncontested that the Halum defendants retained JCWA several months later in March 2021, and all the alleged LUTPA conduct occurred afterwards—when Plaintiffs were no longer involved in the Project nor lost any property. Moreover, it is unclear how amending pre-existing Tax Credit applications and moving forward with the Project, as allowed under the PDA and permitted by Morris, results in *any* ascertainable loss to Plaintiffs. Redmellon incurred the costs of the Trapolin Design before JCWA ever possessed those documents, much less "used" them. There is also no dispute that the Trapolin Design was made for the Project; nor was the design needed or useful for any other Redmellon projects. Plaintiffs have thus not lost *any* money or rights to property from the alleged LUTPA conduct.

There is also no allegation that the LUTPA conduct was done with the intent to injure competition. First, Halum and the Canal Defendants are not Plaintiffs' competitors. Halum and the Canal Defendants were the opposing side in an arm's length negotiation with Plaintiffs—a real estate development company seeking to develop properties. When plaintiffs are not in competition with the defendants, Courts are reluctant to find a LUTPA claim. *See, e.g.*, *Reel Pipe, LLC v. USA Comserv, Inc.*, 427 F. Supp. 3d 786, 806 (E.D. La. 2019); *Landreneau v. Fleet Fin. Grp.*, 197 F. Supp. 2d 551, 557 (M.D. La. 2002). While this alone is not dispositive of the LUTPA claims, *see Andretti Sports Mktg. Louisiana, LLC v. Nola Motorsports Host Comm., Inc.*, 147 F. Supp. 3d 537,

566 (E.D. La. 2015), courts do treat the failure to protect against any LUTPA-protected purpose to warrant dismissal. *See, e.g.*, *Oncale v. CASA of Terrebonne Par., Inc.*, No. CV 19-14760, 2020 WL 3469838, at *19 (E.D. La. June 25, 2020) (holding that when plaintiffs' LUTPA claims did not satisfy a particular LUTPA recognized purpose—protecting consumers, fostering competition, curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry, or protecting the ability of employees to change employment—the claims were subject to dismissal).

These LUTPA claims are rather a way for Plaintiffs to get damages for their failed breach of contract claim—compensation for ownership of the Project materials and reimbursement for the pre-development activities as claimed in the non-binding PDA. LUTPA however is not an alternative remedy for breach of contract claims. *First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, 178 F. Supp. 3d 390, 406 (E.D. La. 2016). Accordingly, LUTPA claims are generally not brought alongside a breach of contract claim when they are based on the same actions. *See, e.g.*, *Retina & Vitreous of Louisiana, Inc. v. Mason*, No. CV 23-158-JWD-SDJ, 2024 WL 3307848, at *15 (M.D. La. Mar. 1, 2024). That is typically so, absent a "narrow exception," because "there is 'a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.'" *Id.*; *D.H. Griffin Wrecking Co., Inc. v. 1031 Canal Dev., LLC*, 463 F. Supp. 3d 713, 724 (E.D. La. 2020) (quoting *Cheramie*, 35 So. 3d at 1060). Plaintiffs' LUTPA claims are nearly identical to the breach of contract claim because the reason why Defendants were not supposed to use the Trapolin Design is because that conduct was allegedly proscribed by the PDA. As the Court has stated above and in its order on the motion to dismiss, any reliance on the PDA is

35

presumptively unreasonable because it is a non-binding letter of intent without a binding final agreement. Plaintiffs confirmed this understanding when Morris characterized the pre-development expenses as a "sunk cost" and explicitly acknowledged that Defendants were "free to go their own way." R. Doc. 82-13 at p. 127.

Contrary to Plaintiffs' view of the record, the Court can discern no reason why Defendants moving forward with the Project, as permitted by Morris, is in some way deceitful, unethical, or against public policy. Any other conduct is not relevant because Plaintiffs failed to suffer any post-PDA injury. Defendants are thus entitled to summary judgment on the LUTPA claims.

## E.  <u>COUNT X: Civil Conspiracy</u>

For Count X, civil conspiracy, Defendants first argue it is preempted by the Copyright Act. But as it did before, the Court rejects these arguments on the same grounds. *See* R. Doc. 117 at pp. 15-16. Defendants now maintain that the civil conspiracy claims must be dismissed because Plaintiffs do not have viable LUTPA claims. R. Doc. 82-3 at p. 31-32; R. Doc. 106 at p. 20. Plaintiffs assert they do. R. Doc. 93 at p. 33.

"Conspiracy by itself is not an actionable claim under Louisiana law," and must be based on an underlying tort. *Crutcher-Tufts Res., Inc. v. Tufts*, 38 So. 3d 987, 991 (La. App. 2010) (citing *Ross v. Conoco, Inc.*, 828 So.2d 546 (La. 2002)). Conspiracy imposes solidary liability on the co-conspirators. Louisiana Civil Code article 2324 provides that a person "who conspires with another person to commit an intentional or willful act is answerable, *in solido*, with that person, for the damage caused by such act." Thus, the actionable element of the conspiracy claim is the "'tort [in] which the conspirators agree to perpetrate and which they actually commit in whole or in part.'"

36

*Crutcher–Tufts*, 38 So.3d at 991 (quoting *Ross*, 828 S.2d at 552). To recover under a conspiracy theory of solidary liability, "a plaintiff must prove that an agreement existed to commit an illegal or tortious act; the act was actually committed and resulted in plaintiff's injury; and there was an agreement as to the intended outcome or result." *Id.* (citing *Butz v. Lynch*, 710 So.2d 1171 (La. App. 1998)).

Plaintiffs base their civil conspiracy claim on the underlying LUTPA violations. The Court has determined that Plaintiffs have no cause of action under LUTPA. Plaintiffs therefore cannot sustain a claim for civil conspiracy claim premised on LUTPA violations. *See, e.g.*, *Watson v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. CIV.A. 14-1312, 2015 WL 5714635, at *9 (E.D. La. Sept. 29, 2015) (dismissing civil conspiracy claims predicated on unfair trade practice violations because the plaintiffs could not sustain a claim for unfair trade practices). Count X must be dismissed.

## F. **COUNT XI: Unjust Enrichment**

Defendants first maintain that the unjust enrichment claims fail because they are preempted by the Copyright Act. Given the Court also rejected this claim in the motion to dismiss, the Court reincorporates this analysis here. R. Doc. 117 at pp. 16-18. Defendants nonetheless argue that the unjust enrichment claims fail on the merits, and if not, the doctrine of unclean hands bars this claim. R. Doc. 82-3 at pp. 32-34. In supplemental briefing, Defendants argue that a plaintiff cannot sustain an unjust enrichment claim in the alternative under Fed. R. Civ. P. 8. *See* R. Doc. 124.

Plaintiffs' opposition argues that the Court should not dismiss the Plaintiffs' unjust enrichment claim until the Court determines that there is no other available remedy at law. R. Doc.

93 at p. 44. In supplemental briefing, Plaintiffs characterize their unjust enrichment claim as Defendants' gain from the pre-development activities. R. Doc. 135 at n. 4.

The Louisiana Supreme Court has set forth five elements for a cause of action based on unjust enrichment: (1) there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection between the enrichment and resulting impoverishment; (4) there must be an absence of 'justification' or 'cause' for the enrichment and the impoverishment; and (5) there must be no other remedy at law available to the plaintiff. *Baker v. Maclay Properties Co.*, 648 So.2d 888, 897 (La. 1995). The plaintiff must prove each of the five elements. *Carriere v. Bank of Louisiana*, 702 So.2d 648, 658 (La. 1996); *Fagot v. Parsons*, 958 So.2d 750, 752–753 (La. App. 2007).

The Court finds Plaintiffs' unjust enrichment claim fails under the impoverishment element because any loss is traceable to Plaintiffs' decision to pursue a deal without a contractual agreement. Plaintiffs plead unjust enrichment solely in the alternative and do not add any operative facts to their claim. R. Doc. 31. at p. 31. Like the LUTPA claims, the alleged injures are (a) Plaintiffs' expenditure in Pre-Development expenses and (b) Halum and JCWA's pursuit of the Project and the Tax Credit applications—post-Redmellon's involvement.

"[A] person is impoverished when his patrimonial assets diminish or his liabilities increase." La. Civ.Code Ann. art. 2298 cmt. (b). Louisiana courts have further clarified that "one is impoverished when ... a 'justified expectation of gain' is prevented." *Munro v. Carstensen*, 945 So.2d 961, 966 (La. Ct. App. 2006). However, "the root principle of an unjustified enrichment ... is that the plaintiff suffers an economic detriment for which he should not be responsible." *Scott*

*v. Wesley*, 589 So.2d 26, 27 (La. App. 1991). When a plaintiff pursues a deal but the transaction does not come to fruition, these are treated as "cost[s] of doing business" which cannot constitute an impoverishment. *Ramsey Const. Co. v. Bunch*, 393 So.2d 199, 199 (La. Ct. App. 1980); *see also Zeising v. Shelton*, 648 F. App'x 434, 438 (5th Cir. 2016) (per curiam). In *Ramsey*, the court rejected the plaintiff's unjust enrichment claim following the collapse of a potential deal because the plaintiff there was "simply incurring a cost of doing business, in hope[s]…the transaction [would] come to fruition." 393 So.2d at 199.

The impoverishment element also requires that the plaintiff show his impoverishment was not a result of his fault, negligence, or was undertaken at his own risk. *Charrier v. Bell*, 496 So.2d 601, 607 (La. App. 1986). Courts have recognized that a sophisticated party acts "out of his own negligence" and "at his own risk" when he pursues a business transaction without specific contractual guarantees. *See, e.g.*, *Bamburg Steel Buildings, Inc. v. Lawrence Gen. Corp.*, 36,005 817 So. 2d 427, 439 (La. App. 2002) (holding a plaintiff could not sustain an unjust enrichment claim because the plaintiff was an experienced party that should have anticipated that he may not be fully compensated under the agreement); *see also Zeising*, 648 F. App'x at 438 (holding that a plaintiff acted out of his own negligence and was not impoverished when he incurred expenses in a business transaction, a proposed partnership, "without a written *contract*") (emphasis added).

Here, Plaintiffs and Morris—a sophisticated real estate developer—proceeded at their own risk when negotiating with the Halum Defendants. The record reflects that Halum acted consistently with his own business interests during the negotiation, did not evidence any bad faith in his dealings with Morris as he attempted to re-negotiate, and only turned to JCWA when

39

Plaintiffs could not secure agreeable financing twice. Plaintiffs explicitly acknowledged the risk of incurring pre-development expenses without a valid, final written contract. Morris's April 22, 2020 email concedes as much when he states that Redmellon was unable to move forward with the Project, that Halum could look elsewhere, and that it was willing to lose pre-development expenses as a "sunk cost." R. Doc. 82-13 at p. 127. Plaintiffs' fault here is incurring costs without contractual guarantees. The same conclusion applies for any activities with regards to the Tax Credit Applications. Plaintiffs prepared the Tax Credit Applications without any contractual guarantee that the Halum Defendants would contractually bound to move forward with the Project. The alleged activity in amending the Tax Credit Applications occurred after Redmellon left the Project. So Plaintiffs likewise do not show how amending existing tax credit applications impoverishes Plaintiffs. There is also no suggestion that the Trapolin designs, or any materials related to the Project, are useful to Plaintiffs' subsequent work.

Plaintiffs' losses are due to its own fault and risk in negotiating with the Halum Defendants without a contractual agreement. Any other actions did not impoverish Plaintiffs. Defendants are also entitled to summary judgment on the unjust enrichment claim. Accordingly,

**IT IS ORDERED** that Defendants Motion for Summary Judgment, R. Doc. 82, is **GRANTED.**

**IT IS FURTHER ORDERED** that all claims in Plaintiffs' First Amended Complaint are **DISMISSED WITH PREJUDICE**. The Court will enter judgment in favor of the Defendants.

**IT IS FURTHER ORDERED** that the pending motions in limine, R. Docs. 84, 85, 86, 87, are **DENIED AS MOOT**.

New Orleans, Louisiana, this 27th day of March 2025.

GREG GERARD GUIDRY
UNITED STATES DISTRICT JUDGE